# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-673

STATE OF LOUISIANA

VERSUS

JIMMY L. BARTIE

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 22315-08
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT
JUDGE**

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and Billy Howard Ezell, Judges.

**REMANDED FOR DISPOSITION OF ATTEMPTED AGGRAVATED
KIDNAPPING CHARGE.
CONVICTION AND SENTENCE FOR AGGRAVATED KIDNAPPING
VACATED; CONVICTION FOR SECOND DEGREE KIDNAPPING
ENTERED AND REMANDED FOR SENTENCING.
ALL OTHER CONVICTIONS AFFIRMED.
SENTENCES FOR ARMED ROBBERY WITH A FIREARM VACATED
AND REMANDED FOR RESENTENCING;
REMAINING SENTENCES AFFIRMED.**

**John Foster DeRosier**
**Fourteenth Judicial District Court District Attorney**
**Carla Sue Sigler**
**Karen C. McLellan**
**Assistant District Attorneys**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR STATE-APPELLEE:**
     **State of Louisiana**

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**P. O. Box 2806**
**Monroe, LA 71207**
**(318) 855-6038**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **Jimmy L. Bartie**

**Jimmy L. Bartie**
**Louisiana State Penitentiary**
**General Delivery**
**Angola, LA 70712**
**Pro Se**

**PICKETT, Judge.**

<u>**FACTS**</u>

On the evening of October 27, 2008, and early morning of October 28, 2008, the defendant and an accomplice committed a string of violent crimes. The first victim was kidnapped at gunpoint and forced to drive the defendant and his accomplice around town in his own vehicle. He was later forced into the trunk where he rode around town until he was able to free himself and escape. Soon thereafter, the second victim was robbed at gunpoint of his wallet. Next, the third victim was driving down the road when she was struck from behind by the defendant and his accomplice who were in the vehicle belonging to the first victim. When she stopped to assess for damage to her vehicle, the defendant and his accomplice held her at gunpoint. They attempted to force the victim into the trunk but fled the scene to avoid detection by an oncoming car, taking the victim's vehicle and the vehicle belonging to the first victim. The fourth and last victim was also struck from behind by the defendant and his accomplice who were driving the vehicle belonging to the third victim. The victim was also held at gunpoint. When he was instructed to get in the truck, he attempted to escape and was shot in the back.

On November 13, 2008, the defendant was indicted by a grand jury as follows:

Count 1:  Armed robbery with a firearm, in violation of La.R.S. 14:64.3;

Count 2:  Carjacking, in violation of La.R.S. 14:64.2;

Count 3:  Aggravated kidnapping, in violation of La.R.S. 14:44;

Count 4:  Armed robbery with a firearm, in violation of La.R.S. 14:64.3;

Count 5: Attempted first degree murder, in violation of La.R.S. 14:27 and 14:30;

Count 6: Armed robbery with a firearm, in violation of La.R.S. 14:64.3;

Count 7: Attempted aggravated kidnapping, in violation of La.R.S. 14:27 and 14:44; and

Count 8: Carjacking, in violation of La.R.S. 14:64.2.

Following a jury trial, the defendant was found guilty as charged in Counts 1, 2, 3, 4, 5, 6, and 8 on September 8, 2011.

On November 2, 2011, the defendant was sentenced as follows: aggravated kidnapping - life imprisonment; attempted first degree murder - fifty years "without benefit"; two counts of carjacking - twenty years "without benefit" on each count, to run concurrently with each other and all other sentences; and three counts of armed robbery - fifty years "without benefit," on each count, to run consecutively to each other and all other sentences. The defendant did not object to his sentences or file a motion to reconsider his sentences.

The defendant is now before this court on appeal, arguing that the evidence adduced at trial was insufficient to support his convictions. The defendant also contends that his sentences of life imprisonment plus a consecutive 150 years is excessive under the facts and circumstance of the case.

## ASSIGNMENTS OF ERROR

1. The evidence adduced at trial was insufficient to support findings of guilt on the offenses for which Mr. Bartie was charged.

2. The sentence of life plus one hundred and fifty years, consecutive, is excessive under the facts and circumstances of this case.

In his pro se brief to this court, the defendant argues the evidence is insufficient to support the convictions.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find several errors patent.

A verdict was not returned on count seven in the indictment, attempted aggravated kidnapping. Louisiana Code of Criminal Procedure Article 819 provides: "If there is more than one count in an indictment, the jury must find a verdict as to each count, unless it cannot agree on a verdict as to a count." In the briefs submitted by the state and the defendant, the parties state, citing record page twenty, that the state informed the trial court it was not going to trial on the charge of attempted aggravated kidnapping. Page twenty of the record, which is a minute entry of voir dire held on September 7, 2011, provides in pertinent part: "The Deputy Clerk informs the Court that Mr. Blake did not read out the charge of Attempted Aggravated Kidnapping nor doe[s] the record reflect that that [sic] charge has ever been dismissed. The Court questions Mr. Blake and Mr. Blake states he is not going to trial on that charge." The transcript of that proceeding provides in pertinent part:

MR. BLAKE:

He's charged with the following: Armed robbery with a firearm, three counts; two counts of carjacking; aggravated kidnapping, and attempted first-degree murder.

THE COURT:

Okay. And Mr. Shelton represents the defendant. Go ahead and introduce yourself, Mr. Shelton.

MR. SHELTON:

Yes, I'm Robert Shelton. I'm counsel for the defendant, Mr. Jimmy Bartie. This is Mr. Bartie, my client.

3

THE DEFENDANT:

Jimmy Bartie, and I appreciate that [sic] y'all hearing my case today. Thank you.

THE COURT:

Okay. The clerk points out that there was a -- does it continue on the second page, Mr. Blake? Was there another charge on the second page?

MR. BLAKE:

No, sir, Your Honor. I think they just listed each count, but it's not another charge.

THE COURT:

Our indictment – unless they mentioned it. Well, on the indictment page, it doesn't say that. Come see, Mr. Blake and Mr. Shelton.

COURT REPORTER:

Do y'all want this on the record?

THE COURT:

Off the record.

[Whereupon, a bench conference is held off the record; after which proceedings resume in open courts as follows:]

THE COURT:

So, madam clerk, I'll ask you to swear in this group of prospective jurors.

In *State v. Hypolite*, 04-1658 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, *writ denied*, 06-618 (La. 9/22/06), 937 So.2d 381, on error patent review, this court recognized that seven of the counts charged in the bill of information had not been properly disposed of citing La.Code Crim.P. art. 819. The record did not contain an amended bill of information or a motion to sever the charges. This court remanded the case for a proper disposition of the charges.

4

We find there has not been a proper disposition of the attempted aggravated kidnapping charge. The record before this court does not indicate the bill was amended to delete the charge, that the State *nolle prossed* the charge, or that the state severed the charge. We are remanding to the trial court for a proper disposition of the attempted aggravated kidnapping charge.

Next, this court finds an error patent regarding the sentencing.

The minute entry of sentencing provides in pertinent part:

As to the charge of Aggravated Kidnapping, the Court sentences the defendant to Life in Prison. As to the charge of Attempted First Degree Murder, the Court sentences the defendant to serve fifty (50) years in the Department of Corrections, to be served without benefit of probation, parole or suspension of sentence. As to the charges of Car Jacking [sic] (2 counts), the Court sentences the defendant to serve twenty (20) years in the Department of Corrections on each charge to run concurrent with each other, and to be served without benefit of probation, parole or suspension of sentence. As to the charges of Armed Robbery (3 Counts), the Court sentences the defendant to serve fifty (50) years in the Department of Corrections on each charge to run consecutive to each other and consecutive to all other charges. The Court orders all charges to run concurrent with each other, with the exception of the Armed Robbery Charges.

We reviewed the sentencing transcript to determine if the court minutes accurately reflect the transcript. The sentencing transcript provided in pertinent part:

THE COURT:

Give me the range of sentencing that's available to me on the armed robbery with a firearm.

MR. BLAKE:

The available sentences, let's see, are not less than ten nor more than ninety-nine years, Your Honor. Also, you want the car jacking [sic], too?

THE COURT:

I've got that, two to twenty.

MR. BLAKE:

Yes, two to twenty.

THE COURT:

And the aggravated kidnaping, I don't have that, and the attempted first degree, I don't have that.

MR. BLAKE:

On the aggravated kidnaping you're dealing with punished [sic] by life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.

THE COURT:

Okay.

MR. BLAKE:

And I think the attempted first degree murder, I think it's up to 50, Your Honor.

THE COURT:

Up to?

MR. BLAKE:

Fifty, I think.

THE COURT:

Well, let's make sure. Ten to fifty.

MR. BLAKE:

Ten to fifty, yeah.

. . . .

THE COURT:

Okay. Then on the aggravated kidnaping [sic] I'm going to sentence him to life, the maximum sentence. On the attempted first degree murder I'm going to sentence him to fifty (50) years without benefit. The car jacking [sic] I'm going to sentence him to the maximum was there more than one count?

6

MR.  BLAKE:

There was [sic] two counts, Judge.

THE  COURT:

Two counts, to run concurrent, twenty (20) years, concurrent, without benefit. On the armed robbery I'm going to sentence him to fifty (50) years as a consecutive sentence to all other sentences, without benefit. This was an incredibly chilling episode of chaos that gripped the community for a couple of days, and so it has to be dealt with accordingly.

. . . .

THE  COURT:

Three counts of armed robbery.

MR.  BLAKE:

Yes, sir.

THE  COURT:

That's fifty (50) years on the armed robbery, on each, consecutive, without benefit.

. . . .

THE  COURT:

Fifty (50) years consecutive on each armed robbery charge, that's fifty times three. We did the two car jackings [sic], that's times two. The aggravated kidnaping, that was just one count, correct?

. . . .

THE COURT:

Okay.  So it's the maximum on everything but the armed robbery, and that's fifty (50), and it's times three consecutive.  Okay. The only other thing that was the car jacking [sic], there were two of those, that's concurrent with everything else.

The trial court imposed indeterminate sentences for the armed robbery with use of a firearm convictions.  The state charged the defendant with armed robbery with a firearm, citing La.R.S. 14:64.3. The jury convicted the defendant of armed

7

robbery with a firearm. At the sentencing hearing, the trial court asked the state, "Give me the range of sentencing that's available to me on the armed robbery with a firearm." The state responded, "[N]ot less than ten nor more than ninety-nine years, Your Honor."

Louisiana Revised Statutes 14:64 provides a penalty of ten to ninety-nine years without the benefit of probation, parole, or suspension of sentence. Louisiana Revised Statutes 14:64.3(A) provides:

> When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence. The additional penalty imposed pursuant to this Subsection shall be served consecutively to the sentence imposed under the provisions of R.S. 14:64.

The state failed to inform the trial court of the enhancement penalty. The trial court sentenced the defendant to fifty years on each count. The record indicates it was the intent of the trial court to sentence the defendant for the penalties of armed robbery with a firearm, violations of La.R.S. 14:64 and 14:64.3. In *State v. White*, 42,725 (La.App. 2 Cir. 10/24/07), 968 So.2d 901, the defendant was convicted of two counts of armed robbery with a firearm and sentenced to thirty years at hard labor without benefit of parole, probation, or suspension of sentence on each count to run concurrently. On error patent review, the court noted that the trial court did not specify what portion, if any, of the defendant's thirty-five year hard labor sentence without benefits was imposed under La.R.S. 14:64.3. The court found that the absence of a specification that the defendant's sentences included a term under La.R.S. 14:64.3 rendered the defendant's sentence indeterminate. The court vacated the sentences and remand for resentencing according to law for clarification of whether the defendant's sentences included

any additional punishment under La.R.S. 14:64.3. *Id. See also*, *State v. Billingsley*, 11-1425 (La.App. 3 Cir. 3/14/12), 86 So.3d 872.

Accordingly, in this case, we vacate the sentences imposed on the convictions of the armed robbery with a firearm and remand to the trial court for resentencing in accordance with La.R.S. 14:64 and 14:64.3. The trial court should clearly set forth the portion of the sentence enhanced under La.R.S. 14:64.3.

## ASSIGNMENT OF ERROR NUMBER ONE

By this assignment of error and in his pro se brief to this court, the defendant argues that the evidence did not establish beyond a reasonable doubt that he was involved in the offenses for which he was convicted. The defendant maintains that the only evidence presented at trial which pointed to him was a "belated" lineup identification by victim Lethaniel Leday. As such, the defendant concludes that the state did not negate any reasonable probability of misidentification.

The analysis for a claim of insufficient evidence is well-settled:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id*.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

> A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. *State v. Davis*, 02-1043, p. 3 (La.6/27/03); 848 So.2d 557, 559. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed

by the fact finder, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 02-1869, p. 16 (La.4/14/04); 874 So.2d 66, 79.

*State v. Dorsey*, 10-216, pp. 43-44 (La. 9/7/11), 74 So.3d 603, 634, *cert. denied*, ___ U.S. ___, 132 S.Ct. 1859 (2012).

The first offense involved victim Lethaniel LeDay. LeDay testified that on the night of October 27, 2008, he was driving his 1996 silver Chevrolet Caprice and stopped at Walgreens to use the payphone to call his girlfriend. While he was talking, he turned around and saw two black men approaching him, wearing black hoodies. One of the men asked LeDay if he had change for either $100 or $50. LeDay told him no and explained that he did not keep that kind of money on his person. As LeDay started to walk away, the man lifted his shirt to expose a gun and instructed LeDay to get in his car. LeDay was then forced at gun point to drive the two men around town. He was later directed to a dark area where he was ordered to stop the car and get out. LeDay complied and was then pushed into the backseat where he was searched for money. The men subsequently demanded his keys and jerked them from his hand. The men continued to question LeDay regarding the whereabouts of his money. LeDay repeated that he had no money, he had to work like everyone else, and he had to be at work that morning at 5:00 a.m. LeDay stressed to the man that if he did not show up for work, people would start looking for him. The man told him not to worry about that because he was going to deal with it. LeDay pleaded for the two men to take his car, telling them he would not call the police. He explained that he had kids and just wanted to go home. He was scared at that point.

When the assailants were unable to open the trunk, they commanded LeDay to open it. After LeDay complied, the men began rummaging through the trunk and found nothing. Next, LeDay was instructed to get in the trunk. The men

subsequently drove around for a bit before stopping again. LeDay could hear the men digging though the glove compartment and then the armrest where he kept his identification. One of the men called out LeDay's name and address and told LeDay he had better shut up because they knew where he lived. LeDay complained that it was cold and difficult to breathe in the trunk. They told LeDay he would be all right. After they started driving again, LeDay managed to get the trunk to open. When the vehicle slowed down a little bit, he jumped out and started running. Leday avoided capture by ducking behind trees and bushes, eventually making his way to a nearby residence. He asked the resident to call the police, and a police officer arrived soon thereafter.

LeDay identified the defendant in open court as one of his assailants. During his interview with police, LeDay indicated that he could identify the perpetrators, and he was later shown a photographic lineup. LeDay maintained that he was not influenced in any way with regard to his identification of the defendant, and he denied that he was coached to identify the defendant as a perpetrator.

On cross-examination, Leday testified he was shown the photographic lineup around eight or nine o'clock in the morning following the incident. Although he was unable to see their faces at the time the two suspects approached him, LeDay saw the perpetrator's face when he was driving the two men around. The perpetrator's hoodie was off during this time. The second suspect who was sitting behind LeDay kept his hoodie on the entire time. LeDay never saw the face of the second suspect. According to LeDay, the defendant was the man that sat in the front seat. He could not recall if either of the suspects had gold teeth.

During rebuttal, the state recalled LeDay to the stand and questioned him further about a photographic lineup from which he was unable to identify the

defendant as a suspect. When asked why he was unable to identify anyone at first, he stated:

> At that time, I was - - I think I was like jittery, and I was kind of terrified a little bit, because in the process of it, when it first started and when they read my identification, called back to me with my name, my address, and everything on it, and at that time, you know, and I didn't want to - - I didn't want to - - you know, nothing to happen to me.

When asked how he was able to identify the defendant in open court as a person who committed the crime, LeDay replied:

> After we left the - - left the station, I went home, and I just - - you know, I just sat up all day. I couldn't sleep after it happened, so I was up for, like, three days straight, and I just couldn't sleep. And the detective had called me, I think - - I'm not too sure of the date or the time, but I think it was the second day, he had called me like later on in the day and asked me to come back down, and he said he needed me to look at a couple of lineups and stuff. And by that time, I had - - was home, and I did - - you know, I did some soul searching, and I just said, "I got to do the right thing."
>
> . . . .
>
> And then he gave me the lineup and he said, "Mr. LeDay, there's a couple of pictures. Could you pick out, you know, the - - whoever - - if anybody looks familiar, just tell me why and how and circle it and put your initials or my name on it." I'm not too sure.

LeDay confirmed that the man he pointed to earlier in court was the person that committed the crime against him.

On cross-examination, LeDay testified that he did not watch television when he returned to his home after viewing the first photographic lineup. LeDay described himself as "paranoid" after the offense, and he sheltered himself in his home. LeDay was certain about his identification of the defendant as his assailant. He explained that after arriving home, he kept seeing the assailant's face every time he tried to close his eyes or go to sleep. He would never forget the person's face. When asked if he saw the individual who was with him in the front seat, LeDay stated:

Yes, sir. When they was approaching me, like when I was at the -- when I turned around from the payphone -- when I was going to the payphone, they was headed southbound on 171. And whenever I turned around from the payphone, they was facing me, they was coming towards me, and the one to the far left had his hood off and one had it on, so whenever they approached me, I -- you know, he asked me for some change and then, you know, and it went from there.

And then when he got in the car, he was sitting like this (indicating), and his hood was off and we -- you know, he was telling me where to go, and I'm kind of looking at him and looking at the road, and he just told me where to go. And then whenever we got to the point where they needed me to be, when he came over the driver's seat, he had the gun to me like this (indicating) and, you know, it was no hood. And then when we got to the back of the trunk, the whole time he's talking to me, I'm like this (indicating), and I'm just studying his face. I'm just trying to get – you know, if I can get – when I get out of this, I won't forget him.

LeDay stated that he identified the defendant on the day after the offense after he was called to return to the police station. As soon as he saw the photographic lineup, LeDay went straight to the defendant's face. LeDay recalled that he was instructed to circle the defendant, indicate how he knew the defendant, and to initial and/or sign the lineup.

With regard to the investigation of the incident, Officer John Thacker with the Lake Charles Police Department testified that he received a call at 11:20 p.m. in reference to a robbery or carjacking at Walgreens. Officer Thacker spoke with the victim, Lethaniel LeDay, who explained that he was on the payphone at Walgreens when he was approached by two, young black male subjects wearing hoodies with the hoods over their heads. After asking LeDay a question, the subjects confronted LeDay with a weapon and advised him to get into his car, a 1996 silver Caprice Classic. LeDay then drove the subjects around until they instructed him to stop and get out of the vehicle. The suspects told LeDay to give them whatever money he had. LeDay advised that he did not have anything, and he was told to get in the trunk of his car. LeDay complied, and the suspects drove

13

around for a while with LeDay in the trunk. Eventually, LeDay was able to open the trunk and escape on foot. He ran up to a residence and banged for someone inside to call the police.

The next incident occurred shortly thereafter that same evening, October 27, 2008. The victim, Demetrius Thomas, testified that he was on his way home from work at around 11:00 p.m. when a tan/brown Caprice drove up. Two men got out the vehicle, both brandishing guns, and told Thomas they wanted some money. Thomas had no money on his person, and he emptied his pockets and opened his wallet to show them. They made Thomas get on his knees, and they returned to their car and drove off. Thomas did not recognize the assailants but observed they were slim-built and about his height, five foot eight, or shorter. Thomas was not shown a lineup after he gave his statement at the police station.

Corporal Hope Kingery Sanders was dispatched to the scene at 11:34 p.m. Upon her arrival, she spoke with Thomas who reported he was walking along the street when a champagne Chevrolet Caprice approached him and stopped. The two occupants were dressed in dark clothing and hoodies. They got out of the vehicle, and the passenger approached Thomas, pointed a gun at him, and demanded all of his money. Thomas replied that had no money. He removed his wallet from his right rear pocket, opened it, and showed the assailant he had no money. The assailant grabbed his wallet, returned to the vehicle, and fled the scene. Thomas was transported to the police station where his statement was taken.

A third incident also occurred on the night of October 27, 2008. Terry Willis was on her way to meet friends when she observed a gray, older model car that was following her. At times, the vehicle got so close to Willis that she was unable to see the vehicle's headlights. Willis was afraid the vehicle would hit her if she tried to turn left into her friends' residence. Willis thought that the driver

14

might have been drunk or was not paying attention. She continued on until the vehicle eventually hit her. Willis turned into a nearby parking lot of a church, and the vehicle pulled in and blocked her in. When she exited her car to check for damage, the driver exited the vehicle and apologized to her. Willis stated that she just wanted to ensure there was nothing wrong with her car. The passenger then exited the vehicle, grabbed Willis by the neck, and held a gun to her head. She described the gun as small and black. She did not notice anything special about the gun. Also, the gun made contact with her head. According to Willis, the assailants were wearing dark clothing, and they were African-American.

Willis testified that the road upon which they were traveling was busy. As cars began to approach the scene, the assailants started to panic. As one of the suspects was getting in the driver's seat of Willis' car, he told her to get in the car. Willis was crying and telling the assailant to just take her car. The assailants then fled the scene, leaving her behind. Willis stopped the next vehicle that approached the scene and borrowed a cell phone. At one point, Willis had her cell phone in her hand, but it was taken from her by one of the suspects.

When asked to describe the persons who committed the offense, Willis responded:

> The - - I really couldn't pay attention to the driver. I was just - - didn't - - you know, I wasn't in face with reality. I just know that the guy was bigger than me, and the other guy was very nervous trying to unlock the trunk. After he was apologizing by the driver's door, he had walked around to the trunk.

On redirect examination, Willis was asked if she saw the assailants who approached her while she was driving her car. Willis responded that it was very dark, and she was not able to see. The police did not provide her with a lineup of possible suspects.

15

Detective Allison Toups with the Calcasieu Parish Sheriff's Office testified that she was dispatched around 11:55 a.m. to investigate a hit-and-run and carjacking. When she arrived on the scene, Willis advised that her vehicle had been stolen at gunpoint by two black males wearing hooded sweatshirts. They also tried to kidnap her. She was driving a blue Nissan Altima and was hit from behind by a silver Caprice. Willis pulled over in a church parking lot to assess the damage, and the driver of the Caprice exited the vehicle and apologized for hitting her. When Willis walked to the rear of her vehicle to check for damage, the passenger got out the Caprice, showed Willis his gun, racked the slide back, and pulled his hood over his head. The assailants then walked Willis to the back of the Caprice and tried to unlock the trunk. When they observed a vehicle traveling towards them, the assailants fled the scene, taking both vehicles. Willis was left behind and flagged down the next vehicle for help.

Detective William Spees with the Calcasieu Parish Sheriff's Office testified that he brought Willis to the sheriff's office, and while speaking to her, he learned that the Caprice had been stolen earlier from Walgreens. The Caprice had been recovered, and Willis' vehicle had been involved in another carjacking/shooting. Willis' vehicle was later recovered along with her cell phone. After obtaining subpoenas for Willis' cell phone records, Detective Spees learned that several calls had been made after the incident, leading first to Clark, and then to the defendant. Several witnesses indicated that the defendant had been seen with Clark that night. On cross-examination, Detective Spees stated that Willis was unable to see or identify either of perpetrators because of the lighting at the scene.

The victim of the fourth incident, Christopher Leon Shakespeare, testified that while driving his blue 2000 Ford Explorer, he was struck from behind by a blue Nissan Altima that had been following him. Shakespeare pulled over and

16

exited his vehicle. As he looked up, the driver of the Altima was holding a gun about a foot or two from Shakespeare's head. Shakespeare described the assailants as black and a little bit shorter than himself. He tried to avoid eye contact with the assailants. By the time the passenger from the Altima got around to Shakespeare, the driver had pulled him behind the Altima. They were situated near the center of the road. Shakespeare did not get a good look at the driver but recalled that he was short. He kept his hand over his eyes so he would not see them. He was frightened.

After taking his wallet, one of the assailants instructed Shakespeare to get in the trunk. He began to walk toward the trunk, and when he reached the trunk, he took off running. He heard gunfire and then fell. Shakespeare was still conscious but acted like he was dead. He heard both car doors slam, and the engines crank. When he looked up, he saw his vehicle and the Altima leaving the scene. Shakespeare tried to get up but was unable to move his legs. At one point, he thought he was dying. He was then taken by ambulance to a hospital.

Shakespeare was not able to identify the assailants because the incident happened so quickly. He never saw their faces. The bullet hit his spine on the left side of his fifth vertebra, and he was in a coma for nine days. He also had nightmares of a black nine millimeter gun that prevented him from sleeping. As a result of the shooting is permanently disabled and he uses a cane to walk.

On cross-examination, Shakespeare testified he was six feet, one inch in height. With regard to the assailants, he observed that the driver was taller than the passenger, and they were wearing hoodies, one black and one gray. The driver was six feet tall or shorter. He saw the passenger from the corner of his eye and could tell he was short, probably five feet tall.

17

Officer Jason Raymond with the Lake Charles Police Department testified that on October 28, 2008, he was dispatched at about 1:00 a.m. in reference to a male subject lying on the street. Upon his arrival, Shakespeare stated he had been carjacked and shot. He explained to Officer Raymond that he had been hit from behind by a small car. Two black males got out of the car and tried to put him in the back of the car. A struggle ensued, and Shakespeare was shot in the back. He did not give Officer Raymond a description of the assailants or the gun used in the offense.

Corporal Bendy Falcon with the Lake Charles Police Department testified that he was also dispatched to the scene. When he arrived, Shakespeare was lying on the road and had been shot and carjacked. The assailants were described as two black males in dark clothing, and their vehicle was a Nissan, possibly an Altima or Maxima.

Corporal Kevin Thomas with the Lake Charles Police Department testified that he spoke with Shakespeare briefly on the scene. Shakespeare indicated he was rear-ended by two unknown black males. The men were in a mid-sized vehicle, possibly an Altima, and Shakespeare was driving a Ford Explorer. When he exited his vehicle, the perpetrators approached him with guns, one black and silver and one solid black. Shakespeare took off running and was shot in the back. None of the witnesses with whom Corporal Thomas spoke saw the initial accident. They only saw Shakespeare land in the middle of the street.

Detective Lesia McCullough with the Lake Charles Police Department testified that she learned about a series of carjackings when she arrived for work on the morning of October 28, 2008. The sheriff's office was also investigating a carjacking with similar circumstances, and the vehicles had been recovered. Detective McCullough and Detective Franklin Fondel started investigating the case

18

from that point and interviewed Joshua Clark, the defendant, and a woman named Ashley. The sheriff's office had developed Clark as a suspect and obtained a warrant for his arrest. Clark's mother made arrangements with the police department for him to turn himself in. He was taken into custody based on the warrant.

A warrant for the defendant's arrest was obtained by the police department following interviews in Rayne, Louisiana. The defendant was transported back to Lake Charles where Detectives McCullough and Fondel met with him. According to Detective McCullough, the defendant's version of the events was very distorted and at one point, he denied knowledge of the events, stating he was not there.

On cross-examination, Detective McCullough testified that photographic lineups were shown to victims LeDay and Shakespeare. LeDay was shown two photo lineups on October 29, 2008. The first lineup included a photo of Clark. LeDay, however, identified another individual as one of the perpetrators. The second lineup included a photo of the defendant. LeDay indicated that he did not see anyone he recognized.

Detective Fondel testified that on October 29, 2008, he interviewed Clark. Following the interview, a warrant for the defendant was obtained. The defendant was located on October 31, 2008, at his girlfriend's residence in Rayne, Louisiana. Following his arrest, the defendant was transported to Lake Charles where he was interviewed by detectives. The defendant maintained he had been in Rayne for two weeks and had not been to Lake Charles during that time. The defendant continued to deny he had been to Lake Charles, even after Detective Fondel told him that his father, sister, and girlfriend all confirmed he had been in Lake Charles, along with Clark. Toward the end of the interview, Detective Fondel brought in the defendant's father. The defendant, however, said that his father was lying and

19

did not see very well. The defendant maintained that his father was mistaken about the date he had been at his father's home.

On cross-examination, Detective Fondel testified that he spoke with the defendant's father on two occasions. After seeing Clark's photo in the paper, the defendant's father called detectives to come to his residence where he gave them information. He was then instructed to go to the police station where detectives obtained a video statement.

Ashley Nicole Johnson, the defendant's ex-girlfriend, testified that on October 27, 2008, she was living in Rayne, Louisiana, and was dating the defendant at that time. According to Johnson, the defendant left her residence on Monday, around 7:00 p.m., and was going to his mother's house in Lake Charles. He returned to Johnson's residence the following day around 6:00 p.m.; nothing was unusual about his return. She did not speak to the defendant about his whereabouts while he was gone, thinking he had actually gone to another girl's house. On Friday, when the police arrived at Johnson's home, they knocked on the door and asked who was inside the home with her. She indicated that the defendant was inside, and they were both arrested. When Johnson was asked on cross-examination how often the defendant visited with her, she stated that he lived with her.

Considering the evidence adduced at trial, we find the state established the defendant was one of the two assailants involved in the offenses herein. First, the defendant was positively identified by one of the victims, Lethanial LeDay, from a photographic lineup and at trial. Although LeDay did not identify the defendant from the first photographic lineup shown to him the morning after the offense, he was certain of the defendant's identification made the following day from a second photographic lineup. LeDay also provided a plausible explanation at trial

20

regarding his inability to identify the defendant from the first photographic lineup — he was jittery and terrified because the assailants had seen his identification which included his address. LeDay was afraid something might happen to him.

LeDay's positive identification of the defendant was supported by circumstantial evidence adduced at trial. The timeline of facts linked LeDay's vehicle to the second and third incidents, and the vehicle taken from Terry Willis during the third incident was then linked to the fourth incident. Additionally, all four incidents involved two black males wearing dark hooded sweatshirts. Lastly, the defendant's participation in the crimes was also supported by the statements of his father and ex-girlfriend. Accordingly, we find there is no merit in this alleged error.

On careful review of the record, we have found that the state failed to prove an element of the offense of aggravated kidnapping. Aggravated kidnapping is defined at La.R.S. 14:44:

> Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
>
> (1) The forcible seizing and carrying of any person from one place to another;  or
>
> (2) The enticing or persuading of any person to go from one place to another;  or
>
> (3) The imprisoning or forcible secreting of any person.

The defendant was convicted of the aggravated kidnapping of the first victim, Mr. LeDay. Once the defendant and his accomplice forced Mr. LeDay into his car, first into the passenger compartment and later into the trunk, there is no evidence that they forced Mr. LeDay, or any other person, to give up anything of value in order to secure Mr. LeDay's release.

21

When the state's case lacks evidence of an essential element of the offense charged, the conviction must be set aside, no matter how the deficiency is brought to the attention of the court. *State v. Raymo*, 419 So.2d 858 (La.1982). We next turn to La.Code Crim.P. art. 821(E), which provides:

> If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.

We find the evidence adduced at trial does support a conviction for the lesser included offense of second degree kidnapping. We therefore modify the verdict and enter a conviction of second degree kidnapping. The sentence is vacated, and we remand the case to the trial court for sentencing for second degree kidnapping.

## ASSIGNMENT OF ERROR NUMBER TWO

By this assignment of error, the defendant argues that sentences are grossly excessive given the nature of the offenses for which he was convicted. As the result of errors patent, we have found that the defendant's sentences for his three convictions for armed robbery with the use of a firearm be vacated. Furthermore, we have vacated the conviction and sentence for aggravated kidnapping. As such, this assignment of error as it pertains to these sentences is now moot.

As noted above, the defendant did not file a written motion to reconsider his sentences as required by La.Code Crim.P. art. 881.1. Immediately following the sentencing hearing, defense counsel stated, "Mr. Bartie understands . . . And we reserve all rights [to appeal sentencing and trial]." Defense counsel did not orally object to the sentences or specify any grounds for an objection. Louisiana Code of Criminal Procedure Article 881.1(E) provides:

> Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the

22

state or the defendant for raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

Accordingly, a review of the defendant's claim is relegated to a bare claim of constitutional excessiveness of his sentences. *State v. Barling*, 00-1241, 00-1591 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

In *State v. Thibodeaux*, 05-680, p. 4 (La.App. 3 Cir. 12/30/05), 918 So.2d 1093, 1095 (alteration in original), this court discussed excessive sentences, as follows:

> A sentence is deemed excessive if the penalty is grossly disproportionate to the severity of the crime as to shock one's sense of justice, or makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Barling*, 00-1241, 00-1591 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, *writ denied*, 01-838 (La.2/1/02), 808 So.2d 331. A trial court has vast discretion in the imposition of a sentence within the statutory limits and such sentence shall not be set aside as excessive absent manifest error. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99), 746 So.2d 124. This court has determined the factors to be considered in deciding whether a sentence is excessive. In *State v. Smith*, 02-719 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, *writ denied*, 03-562 (La.5/30/03), 845 So.2d 1061, this court stated:

>> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*Id*. at 789.

The sentencing range for attempted first degree murder is ten to fifty years at hard labor, without benefit of parole, probation, or suspension of sentence. Thus, the defendant received the maximum possible sentence. La.R.S. 14:30 and 14:27. The sentencing range for carjacking is two to twenty years, without benefit of parole, probation, or suspension of sentence. La.R.S. 14:64.2. Again, the defendant received the maximum possible sentences for his two carjacking convictions. Although the defendant received maximum sentences for attempted first degree murder and carjacking, his sentences for these crimes were ordered to run concurrently with his life sentence for aggravated kidnapping, which has now been vacated.

At sentencing, victim Shakespeare addressed the court as follows:

MR. SHAKESPEARE:

It's been a long road, you know, it's been three years now, it's a good day that this day has finally came, but I don't know, I just think that he should get what he gave to me and everybody else, hard time, trouble. Even though it's been three years from this, almost three years and two days three days, you know, I go through everything – I mean, I have problems every day, I mean, from walking, running, playing with my kids, and it's just hard, but, you know, I'm just happy to be here and get this over with and I trust that the justice system will do the right thing. That's all I have to say. Thank you.

THE COURT:

Well, you've got a great attitude for someone who has gone through hell, and I appreciate you testifying and speaking today.

MR. SHAKESPEARE:

Thank you.

THE COURT:

Thank you, sir.

The state subsequently stressed that the defendant was found guilty as charged by a jury of his peers and urged the trial court to impose the maximum

sentences. The State addressed the defendant's criminal history, including simple robbery and several other arrests, and emphasized he had wreaked havoc on several individuals for no reason. Lastly, the state maintained the defendant showed no respect for human life, shooting one of the victims and leaving him for dead. Defense counsel, on the other hand, contended that the defendant had some degree of remorse with regard to "some of the instances." Given the opportunity, however, the defendant chose not to speak on his behalf at sentencing. Defense counsel stated that the defendant had no reason to say anything at sentencing.

Considering the serious nature and violence used in the commission of the offenses, the trial court in its discretion could have reasonably imposed consecutive sentences for one or more of these offenses even though they constituted parts of a common scheme or plan. "Although Louisiana law favors concurrent sentences for crimes committed as part of a single transaction, La.C.Cr.P. art. 883; *State v. Underwood*, 353 So.2d 1013, 1019 (La.1977), a trial judge retains discretion to impose consecutive penalties on the basis of other factors, including the offender's past criminality, violence in the charged crimes, or the risk he or she poses to the general safety of the community. *State v. Williams*, 445 So.2d 1171, 1182 (La.1984); *State v. Jacobs*, 371 So.2d 727, 732-33 (La.1979) (on reh'g)." *State v. Thomas*, 98-1144, p. 1 (La. 10/9/98), 719 So.2d 49, 49. Additionally, with regard to the maximum sentences imposed on the defendant, the courts agree that maximum sentences are typically reserved for the most serious offenses and the most egregious offenders. *See State v. Baker*, 08-54 (La.App. 3 Cir. 5/7/08), 986 So.2d 682. Accordingly, we find the defendant's concurrent sentences for attempted first degree murder and carjacking are not excessive.

On appeal, the defendant acknowledges that his conviction for aggravated kidnapping carries a mandatory life sentence. Also, he has not asserted that the

25

trial court should have departed from same. He takes issue, however, with the additional one hundred fifty years imposed for his convictions of armed robbery with a firearm to run consecutively with his life sentence. He complains that it is humanly impossible to serve such a sentence. In light of our order to vacate the defendant's sentences for aggravated kidnapping and armed robbery with a firearm, this argument is now moot.

We find there is no merit to this assignment of error.

## CONCLUSION

The defendant's conviction and sentence for aggravated kidnapping are vacated. We find the defendant guilty of the lesser and included offense of second degree kidnapping and remand for sentencing. His sentences for attempted first degree murder and carjacking are affirmed. The defendant's sentences imposed on the convictions of armed robbery with the use of a firearm are vacated, and the case remanded to the trial court for resentencing in accordance with La.R.S. 14:64 and 14:64.3. The trial court should clearly set forth the portion of the sentence enhanced under La.R.S. 14:64.3. Additionally, the matter is remanded to the trial court for proper disposition of the attempted aggravated kidnapping charge.

**REMANDED FOR DISPOSITION OF ATTEMPTED AGGRAVATED KIDNAPPING CHARGE.**
**CONVICTION AND SENTENCE FOR AGGRAVATED KIDNAPPING VACATED; CONVICTION FOR SECOND DEGREE KIDNAPPING ENTERED AND REMANDED FOR SENTENCING. ALL OTHER CONVICTIONS AFFIRMED.**
**SENTENCES FOR ARMED ROBBERY WITH A FIREARM VACATED AND REMANDED FOR RESENTENCING; REMAINING SENTENCES AFFIRMED.**

26