STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 14-608


STATE OF LOUISIANA

VERSUS

STEPHAN M. BERGERON


**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 09-K-4229-A
HONORABLE JAMES PAUL DOHERTY JR., DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Billy Howard Ezell, Judges.


**AFFIRMED.**



**THIBODEAUX, Chief Judge, concurring in part and dissenting in part.**

**Edward John Marquet**
**Louisiana Appellate Project**
**Post Office Box 53733**
**Lafayette, LA 70505-3733**
**(337) 237-6841**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Stephan M. Bergeron**

**Earl B. Taylor**
**District Attorney**
**Jennifer Ardoin**
**Assistant District Attorney**
**Twenty Seventh Judicial District Court**
**P. O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**EZELL, Judge.**

On December 8, 2009, Defendant, Stephan M. Bergeron, was charged by grand jury indictment with one count of aggravated rape of S.B., a violation of La.R.S. 14:42, and three counts of forcible rape of S.B., violations of La.R.S. 14:42.1.[1] Defendant entered pleas of not guilty to the charges on January 14, 2010. After several pre-trial motions were filed and heard, jury trial began on May 14, 2013. On May 24, 2013, the jury returned the following verdicts: Count One – not guilty of aggravated rape; Count two – guilty of simple rape; Count three – guilty of forcible rape; and Count four – guilty of simple rape. On each count, the jury's vote was ten to two.[2]

Thereafter, on November 25, 2013, Defendant filed a Motion for Post Verdict Judgment of Acquittal; Alternatively, Motion for New Trial and a Motion in Arrest of Judgment. At a hearing held December 2, 2013, the trial court denied all motions. During the same hearing, the trial judge sentenced Defendant as follows: simple rape (two counts) – twenty-five years at hard labor without the benefit of probation, parole, or suspension of sentence on each count; and forcible rape (one count) – forty years at hard labor, the first two years without benefit of probation, parole, or suspension of sentence. The sentences were ordered to run concurrently. On December 6, 2013, Defendant filed a Motion for Reconsideration of Sentence, which was denied on May 1, 2014, after a hearing.

On May 6, 2014, Defendant filed a Motion for Appeal and Designation of Record. The trial court granted the motion on May 7, 2014. Defendant is now before this court, alleging two assignments of error – the first involving the

---

[1]Pursuant to La.R.S. 46:1844(W), the victim's initials are used to protect her identity.

[2]When the jury originally returned to the courtroom with its verdicts, the vote on each count was nine to three. The trial court ordered the jury to return to deliberations, and the jury subsequently returned to the courtroom with a vote on each count of ten to two.

1

admission of other crimes evidence and the second involving the sentences imposed.

**FACTS**

After dating about a month, Defendant and the victim (S.B.) got married. Defendant was seventeen, and S.B. was eighteen when they married. Within their four-year marriage, S.B. alleges that Defendant raped her several times. In addition to the rapes, S.B. testified that Defendant physically and verbally abused her.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record.

Defendant was sentenced immediately after the denial of his Motion for Post Verdict Judgment of Acquittal; Alternatively, Motion for New Trial and Motion in Arrest of Judgment. The court stated that it would proceed to sentencing because more than three days had elapsed since Defendant's conviction. Louisiana Code of Criminal Procedure Article 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

Thus, Defendant should not have been sentenced until twenty-four hours after the denial of the motions, unless the delay was waived.

In *State v. Westmoreland*, 10-1408, p. 3 (La.App. 3 Cir. 5/4/11), 63 So.3d 373, 377, *writ denied*, 11-1660 (La. 1/20/12), 78 So.3d 140 (footnote omitted) (alteration in original), this court held:

2

However, there is no violation of Article 873 where there is an express or implied waiver of the delay. *State v. C.S.D.*, 08-877 (La.App. 3 Cir. 2/4/09), 4 So.3d 204. A defendant can expressly waive the delay when he announces his readiness for sentencing or responds affirmatively when the trial court asks if he wants to be sentenced on that date. *State v. Schmidt*, 99-1412 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, *writ denied*, 00-2950 (La.9/28/01), 798 So.2d 105, *cert. denied*, 535 U.S. 905, 122 S.Ct. 1205, 152 L.Ed.2d 143 (2002). A panel of this court has previously found that a defendant may impliedly waive the delay where there is evidence in the record that the defendant was aware of the sentencing date, did not object to the delay, and participated in the sentencing hearing and where the trial court thoroughly set forth its reasons for sentencing. *Id.*

In the present case, on May 24, 2013, at the conclusion of the trial, sentencing was set for August 1, 2013. On July 22, 2013, the defense filed a motion for a complete transcript of the proceedings and a motion for continuance. Sentencing was continued to October 3, 2013. On September 25, 2013, the court continued the matter to November 7, 2013, due to the requested transcript being incomplete. Minutes dated October 4, 2013, indicate that defense counsel was present in court when sentencing was refixed for December 2, 2013. The post-trial motions filed by the defense on November 25, 2013, were set for hearing on December 2, 1013. Thus, the record indicates the defense was aware the sentencing would be taken up on December 2, 2013.

The defense voiced no objection when sentencing was taken up immediately after the denial of the post-trial motions. After the victim addressed the court, the defense presented witnesses and evidence in support of the imposition of a lenient sentence. The trial court's comments prior to imposing sentence clearly indicated that it had carefully considered what would be appropriate sentences to impose, and the sentences were supported with ample reasons. We note that in his brief to this court, defense counsel does not assign as error the trial court's failure to delay sentencing and he does not allege any prejudice as a result of the error. This court

finds the facts in this case support an implied waiver of the delay required by La.Code Crim.P. art. 873, so we find no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

In this assignment, Defendant alleges that the trial court improperly admitted other crimes evidence by allowing the testimonies of H.R. and T.G., two women who claimed Defendant forced himself upon them sexually. Prior to trial, the State filed a notice of intent to introduce other crimes evidence through the testimonies of three women – Chelsea Pryor, H.R., and T.G.. In this assignment of error, Defendant alleges error as to the admission of the testimonies of H.R. and T.G. but alleges no error as to the testimony of Chelsea. Thus, we will not address the admissibility of Chelsea's testimony.

At the pre-trial hearing, as to the admissibility of the other crimes evidence, the victim, S.B., first testified as to her allegations against Defendant. S.B. testified that she and Defendant were married for four years. S.B. was eighteen, and Defendant was seventeen when the two got married. The couple started dating in November 2006 and were married in December 2006. According to S.B., Defendant soon began separating her from her family. The first time Defendant raped her, S.B. testified, was in late December 2006, or early January 2007. Defendant became angry with S.B. after reading some old messages on her MySpace account. Defendant wanted to know details of S.B.'s past relationships and began hitting her and pushing her around. Defendant also whipped S.B.'s legs with his belt, causing whelps all over her legs. Defendant then tied S.B.'s hands and feet with a rope. Using a knife, Defendant cut S.B.'s clothes off of her and began vaginally raping her.

4

The next incident, S.B. testified, occurred about a month later. Again, Defendant was angry with S.B. about her prior relationships. Defendant took S.B.'s clothes off, put her into a cold shower and poured buckets of ice water on her. S.B. remembered the incident lasting about thirty minutes. Within the next couple of days, S.B. and Defendant began having the same argument, and this time the argument ended with Defendant raping S.B.:

> A:  Um, so a day or two later, we began arguing about it again, about the - - me having boyfriends before marrying him and he, this time, did not tie me up because at this point I knew better than to try and run and so he - - he raped me the same way vaginally, this in the same way, saying the same things. "Is this how so and so did it? Did you enjoy it? Do you like this? Does this make you feel good," and I would always cry and say no and ask him to stop."

S.B. testified about various other incidents of abuse as well as the birth of their son, Branson. Branson was sick from birth and had to stay in the hospital for several months.[3] While Branson was in the hospital, S.B. became pregnant with their second child. Eventually, S.B. had to go with Branson to Washington, D.C. for a liver transplant. A couple of days before she left for D.C., the following "rape incident" occurred:

> We got into an argument. Um, I was actually accusing him of cheating. I had already caught him quite a few times before cheating on me and, um, I just - - I just knew that he was and this was, um - - so we started arguing about it and how dare you accuse me of, you know, cheating on you and he hit me with a shoe across my face . . . After the shoe incident, we were in the living room and he said, "Now you know - - You know what you're about to get, right," and I knew what he was talking about. I knew he was going to rape me and I was aware and he said - - because I started crying, and he was like, "You're going to make it worse if you don't cooperate with me," and he said, "So am I going to - - are you going to take off your clothes for me or am I going to - - " Well, actually it started with, "Are you going to walk to the bedroom or am I going to have to drag you to the bedroom," and I said, like "I don't want to do this. Don't do this to me. I don't want - - " You know, "This is going to hurt," and he said, "I'm going to say it again. Are you going to walk to the bedroom or

---

[3]S.B. testified that Branson died in 2010 at age two.

5

am I going to have to drag you there?" So I got up and I walked to the bedroom and when we got in the bedroom, he said, "Now are you going to take your clothes off or am I going to have to do it myself and rip your clothes off," and I started crying again, like please, like begging the last time, like "Please don't do this," and he said, "This is going to happen so you either cooperate, take off your clothes or I'll just have to rip them off." So I took off my clothes and he then put me on the bed and held my face down into the pillow and - - and he raped me anally this time.

After the last rape described above, Defendant told S.B. he thought they should divorce. S.B. left for D.C., and Defendant started a relationship with T.G. When S.B. returned home from D.C., she got a restraining order against Defendant and lived with her family. Defendant begged S.B. to return to him, which she eventually did. S.B. asked the judge to remove the restraining order against Defendant, but the judge refused to do so.

In March, 2009, the final rape incident occurred. S.B. and Defendant were arguing about a photograph of a naked girl that Defendant received on his phone. During the argument, Defendant asked S.B. if she was going to walk to the room or if she was going to make him drag her. S.B. walked to the room, crying and telling him that they did not have to do "this." Defendant took off S.B.'s clothes, forced her on the bed, held the back of her neck, and raped her anally. S.B. begged Defendant to stop, but Defendant only penetrated harder. Afterward, S.B. had a hand print on the back of her neck, which was seen by Defendant's aunt. When made aware of the allegations of rape made by T.G., Defendant told S.B. that he knew he raped S.B., but he did not rape T.G.

H.R. was the next witness to testify at the other crimes evidence hearing. H.R. testified that she and Defendant began seeing each other when she was a sophomore in high school. She and Defendant saw each other for approximately eight months to a year, during which time they had sexual relations. H.R.

6

explained that the first time she and Defendant had sex, she told Defendant she was not comfortable with having sex for both religious and personal reasons. Defendant, however, forced himself upon her:

A:    I mean I kept - - I kept trying to move and I kept telling him to stop.

Q:    Did you try to get away?

A:    I would try to move off, yeah, and he would hold me down, my legs, um, and, um, I was so angry, um, both at what was happening and his expression. Um, I started hitting him on his chest, um, and he just kept giving me the same confused face.

Q:    And he did what he wanted?

A:    Yes, yes.

H.R. further testified:

Q:    Did you make it clear to him that you did not want to have sex with him?

A:    Yes.

Q:    And you told me - - I think you mentioned he was holding your thighs down?

A:  Yes.

Q:  So he forcibly - - He forced himself in you?

A:  Yes.

After their initial sexual encounter, H.R. and Defendant had consensual sex. H.R. also testified that on two or three occasions, Defendant "pinned" her and said, "This is how I could kill you with my bare hands[.]" As for her relationship with family and friends, H.R. testified that Defendant discouraged her from seeing her family and friends.

T.G. also testified at the other crimes evidence hearing. She stated that she and Defendant were boyfriend and girlfriend and that they had sex the first time

T.G. went to Defendant's house. T.G. moved in with Defendant for about a week, at which time T.G. knew that Defendant and S.B. were getting a divorce. T.G. testified that Defendant told her he wanted to kill S.B., that he beat S.B. with a shoe, and that he liked to watch S.B. crawling on the floor and screaming for him to stop. When asked how Defendant was violent towards her, T.G. testified that Defendant held scissors to her throat and stated that he could easily kill her. Another time, on New Year's Eve, Defendant became angry with T.G., slapped her across the face four times, and threw her against a cabinet.

Later, Defendant became angry with T.G. when he learned that she had communicated with her old boyfriend months before. T.G. described the incident as follows:

> A:    Uhm, we got in his car, because my car was at his house, so that he was going to bring me to my car. Uhm, we're driving down the road. And that's when he tells me that he's going to kill me, tonight's the night, get ready to die. Uhm, he grabs my head, smashes it on the window and we drive and he's screaming and I'm crying and we pull into a gas station in Eunice and he gets out. And I remember I had my cell phone with me. And I didn't know if I should call somebody or if I should text, you know. Everything was going through me [sic] head. What do I do now? And that's when he opens the passenger side and laughs at me and says, "Give me your cell phone."
>
> Q:    Okay.
>
> A:    And so . . .
>
> Q:    Does he go in the store?
>
> A:    Uh-huh, he goes into the store. And . . .
>
> Q:    And you're still in the car?
>
> A:    Uh-huh.
>
> Q:    Are you locked in the car?
>
> A:    I'm not. I could have ran. I should have. Uhm, and that went through my head, you know. But at this time he had told me that he was in cahoots with all the cops around here. Uhm, you know, he - -

8

that no where was safe. If I was going to tell anybody, they were already in on it. Uhm, and I thought about running into the gas station and then, what if, you know, the cops there, they know him, you know, is it going to be worse, is the punishment going to be worse if I try to run? Uhm, you know, at that point I was like maybe I can still get out of it some how, like I did the other three times. Because I thought I was going to die the other three times. Uhm, and by the time that I was going to do, he was back in the car.

Q: So once he got back in the car, what happened? Did y'all leave the station?

A: Uh-huh, and we went to his house. And the first thing he tells me to do is take off all my clothes.

Q: And did you do that?

A: Yes, ma'am. He makes me - - it's night time. He made me stand in front of the glass window - - the glass door - -

Q: Uh-huh.

A: - - naked with the lights on so, you know, cars passing, everybody can see.

Q: How long did you have to do that?

A: A couple of minutes. It wasn't a long time. Uhm, he had given me the option to stay there and to deal with the consequences, or that I could get in my car naked and go home, but that he was going to call his cop friends and have them pull me over and rape me on the way home.

Q: Okay.

A: And - -

Q: So what was your choice?

A: - - I picked the car.

Q: You're ready to leave naked?

A: Yeah, absolutely. You know, I didn't know - - I was going to drive faster than the cops were.

Q: Okay.

A: Uhm . . .

Q:     So did you do that?

A:     No, ma-am.  As soon as I said that, he told me, "No, that's not an option anymore."

Q:     Okay, so what happened?

A:     He started telling me how he was going to get his mafia friends to go and kill my family.  Uhm, he's going to kill my mom.  They're going to kill my dad.  They're going to kill my Nannie.  They were going to kill Heather, which is my cousin with the baby.  Uhm, he told me that he was going to get an HIV shot and stick it in me to give me the HIV virus.  He . . .

Q:     Are you still naked during all this?

A:     Uh-hu, uh-huh.  He made me stand up naked and he video taped me.  Calling me a slut, made me say, "I'm a slut."  And he video taped it because he was going to send it to my family to let them know how much of a slut I really was.

Q:     Where were you - - what room of the house were you in?

A:     In the living room.

Q:     Okay; and you're standing naked this whole time?

A:     Uh-huh.

Q:     Okay; so he's telling you to do all these things and does he give you any more options to leave?

A:     No.

Q:     Okay, so what does he do next after he tells you this stuff?

A:     He video tapes me saying that I'm a slut, and then he puts me on the counter, and he rapes me and he video tapes it.  And, the whole time - -

Q:     Vaginally or orally - -

A:     Vaginally.

Q:     - - or anally?

A:     Vaginally, this time.  Uhm . . .

       . . . .

10

Q:    Okay; so, I mean, were you able to fight him off at all?

A:    No, and honestly I was too scared to hit him, to do anything like that. Uhm, like I said at the time, all you're thinking of is, just control the situation, you know. Don't make him mader (sic). Don't make - - just do whatever you got to do to get him to stop or to get him to calm down.

Q:    Okay; so he rapes you, and video tapes you, and then what happens after that?

A:    Then I remember him, he's on the couch and he's calling, he said the guy's name was Benny. Uhm, I was on the floor at this time crying because he was telling Benny to kill my family. Uhm, how he was going to do it. He said, "Kill her dad fast because I don't know him. But, you know, take your time on all the other ones." And I was on the floor crying and he got off the phone. He was like, okay, now, you know, "How are you going to make me not kill your family?" You know, now it's your turn. And, uhm . . .

Q:    What did [you] say? Or did you say anything?

A:    I'll do whatever, you know. I mean, what do I have to do, you know. This whole time this is my fault. In my head, this is my fault that this is happening. You know, these people are going to die and that's my fault.

Q:    You're believing him?

A:    Absolutely.

Q:    Okay.

A:    Uhm . . .

Q:    What did you do?

A:    Well, he picked me up and started anally raping me. And I was crying.

Q:    Where did he put you?

A:    On the couch.

        . . . .

Q:    Okay.

A:    And was, you know, uhm, I was crying hysterically. He threw me off of him and said, "That's not good enough. That I'm going to

11

pick up the phone and your family is going to die now because you can't do this right." And I begged him, I said, I'll do it better, I swear I'll do it better." And I didn't talk. And I . . .

Q:    So you stopped making noise and stopped crying?

A:    Uh-huh.

Q:    Okay; and so he did it again?

A:    Yes, ma'am.

T.G. stayed the night with Defendant.

After hearing the testimonies of the above witnesses, the trial judge gave the parties an opportunity to submit briefs. According to an affidavit prepared by the St. Landry Clerk of Court, no written brief was submitted by Defendant. In fact, we have found nothing in the record wherein defense counsel presented argument (written or oral) as to the other crimes evidence. The other crimes evidence hearing was prompted by the State's Notice of Intent to Introduce Evidence Admissible Under La.Code Evid. art. 404(B) and the State's **Amended** Notice of Intent to Introduce Evidence Admissable Under La.Code Evid. Art. 404(B). The State also submitted a memorandum in support of its motion. No written brief or memorandum was submitted by Defendant in response to the State's motions. On April 11, 2013, the trial judge issued written reasons, finding that the testimonies of H.R. and T.G. were proven by a preponderance of the evidence. The trial judge also found that the testimonies of H.R. and T.G. were relevant to show a pattern in Defendant's deviant attitude and behavior toward women with whom he is in a relationship. Thus, the trial judge found the testimonies of H.R. and T.G. were admissible "under 404(B) as relevant to showing 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." Although Defendant filed a notice of intent to take supervisory writs outlining his

disagreement with the trial court's admission of the other crimes evidence, we have found no record that a writ was actually filed.

On appeal, Defendant argues that the testimonies of H.R. and T.G. should not have been allowed because their stories were not accepted by a grand jury. At the hearing to determine the admissibility of the other crimes evidence, S.B. testified that the grand jury "pretermitted" as to T.G.'s allegations of rape against Defendant and that the grand jury returned a "no true bill" as to H.R.'s allegations of rape against Defendant. Thus, Defendant asserts that the State failed to meet its burden of proving these offenses occurred. Additionally, Defendant argues that he was unduly prejudiced by the admission of the other crimes evidence:

> The undue prejudice attached to the admission of the testimony of H.R. and T.G. is clear. The cases of H.R., T.G. and S.B. [(victim in this case)] can be likened to a one-legged chair. One-legged chairs cannot stand on their own. One-legged chairs, if not propped up, will fall down under their own weight. By combining the three legs of H.R., T.G., and S.B.'s testimony, the court propped up the prosecution's weak case at bar.
>
> A most telling fact that reveals the undue prejudice of this evidence is the fact that Defendant was acquitted of one charge (Aggravated Rape) and initially no verdicts on the remaining counts. (Rec. Vol Eight of Eight, pp. 1808-1809) It was only after the judge sent the jury back to deliberate that a verdict was reached. Without the impermissible testimony of H.R. and T.G., it is submitted that Defendant at the least would have been granted a mistrial.

Finally, Defendant asserts that S.B.'s testimony was "so vague and unsupported" that "only the admission of the 404B testimony saved it from rejection by the jury."

This court finds that since an Article 404(B) hearing was held at which defense counsel questioned witnesses and after which the trial court issued written reasons, the record was sufficiently preserved for this court to review the arguments now raised by Defendant.

First, Defendant alleges that the State failed to satisfy its burden of proving the other crimes occurred since the grand jury "rejected" the allegations made by both H.R. and T.G. For the allegations made by H.R., the grand jury returned a "no true bill," and for the allegations made by T.G., the grand jury "pretermitted" a decision. At the Article 404(B) hearing, the trial judge explained that "pretermitted" means there was no decision. In its Reasons for Judgment, the trial court stated that the testimonies of H.R. and T.G. were proven by a preponderance of the evidence.[4] The court said nothing regarding the grand jury's action, presumably because Defendant failed to raise that specific argument in the trial court. In its brief, the State asserts that "[t]he decision of a grand jury to accept, reject, or pretermit a matter has no bearing on a witness' testimony for purposes of a 404(B) hearing or trial." Furthermore, the State asserts that Defendant's argument rests strictly on the credibility of the witness, which is a question for the trier of fact. Thus, the State argues that it met its burden of proof.

Defendant's argument has no merit. First, Defendant cites no jurisprudence for his proposition that the grand jury's "rejection" of the allegations made by H.R.

---

[4]Defendant does not challenge the trial court's use of the preponderance of the evidence standard and, in fact, asserts in brief that the preponderance of the evidence is the appropriate standard. The supreme court, however, has not yet spoken as to the appropriate standard:

> This court has not yet addressed the extent to which Article 1104 and the burden of proof required by the federal rules, as interpreted in *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), has affected the burden of proof required for the admissibility of other crimes evidence. *State v. Jacobs*, 99-0991, p. 26 n. 15 (La. 5/15/01), 803 So.2d 933, 952 n. 15[*cert. denied*, 5356 U.S. 922, 122 S.Ct. 1219 (2002)]; *State v. Cotton*, 00-0850, p. 11 n. 3 (La. 1/29/01), 778 So.2d 569, 578 n. 3. In the instant case, we need not reach the issue of the applicable burden of proof because we find that the State satisfied its burden under either the clear and convincing evidence standard or the preponderance of the evidence standard.

*State v. Rose*, 06-402, p. 12 (La. 2/22/07), 949 So.2d 1236, 1243 n.3. Likewise, we find it is not necessary to reach the issue of the applicable burden of proof in the present case since Defendant is not challenging the standard used by the trial judge and since the State satisfied its burden under either standard.

and T.G. prevented these allegations from being introduced at trial. As stated by the Louisiana Supreme Court:

> Although a grand jury is generally regarded as an investigatory tool of the prosecutor, the district attorney is not bound by the grand jury's action. As stated in the official revision comment under LSA-C.Cr.P. art. 444, "[t]he return of 'not a true bill' does not operate as an acquittal, and does not preclude a subsequent charge of the crime by an information filed by the district attorney or by an indictment returned by a subsequent grand jury." The grand jury action does not sustain a plea of "autrefois aquit". Thus, defendant was not acquitted by virtue of the grand jury's no true bill.

*State v. Tanner*, 425 So.2d 760, 762 (La.1983) (footnote omitted) (alteration in original). Furthermore, as noted by the trial judge in the present case, the grand jury's decision to "pretermit" as to the allegations made by H.R. simply meant it reached no decision. Lastly, defense counsel was able to tell the jury in his opening statement about the grand jury's decision as to both H.R. and T.G.'s allegations. Thus, Defendant was able to use the grand juries' decisions to his advantage.

As to Defendant's claim that he was unduly prejudiced by the admission of H.R. and T.G.'s testimonies, this claim also lacks merit. Defendant argues that the testimonies of H.R. and T.G. "propped" up the State's weak case against Defendant and without these testimonies, the jury would not have convicted Defendant. Louisiana Code of Evidence Article 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

The supreme court explained Article 403's balancing test as follows:

> Although a defendant's prior bad acts may be relevant and otherwise admissible under La.C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La.C.E. art. 403. Any

incluplatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. *State v. Germain*, 433 So.2d 110, 118 (La.1983). As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. *Id. See also Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").

*State v. Rose*, 06-402, p. 13 (La. 2/22/07), 949 So.2d 1236, 1243-44.

At the trial in this case, S.B. (the victim) testified as to the rapes committed against her by Defendant. S.B.'s trial testimony was substantially the same as her testimony at the Article 404(B) hearing. It is well-settled that a victim's testimony alone is sufficient to support a verdict as long as that testimony was believed by the trier of fact and that testimony does not contain internal contradictions or irreconcilable conflicts with physical evidence:

> A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. *State v. Davis*, 02-1043, p. 3 (La.6/27/03); 848 So.2d 557, 559. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 02-1869, p. 16 (La.4/14/04); 874 So.2d 66, 79.

*State v. Dorsey*, 10-216, pp. 43-44 (La. 9/7/11), 74 So.3d 603, 634, *cert. denied*, ___ U.S. ___, 132 S.Ct. 1859 (2012).[5] Additionally, the jury heard the testimony of S.B.'s sister as to what S.B. told her about Defendant's conduct – i.e., that Defendant would make her have sex with him, that sex hurts when you do not want to do it, that Defendant cut her clothes off and had sex with her, that Defendant hog tied her and had sex with her, that Defendant stripped her naked and shoved her out of the door, that Defendant poured cold water on her, that Defendant

---

[5]On appeal, Defendant does not challenge the sufficiency of the evidence.

slammed her head against the front door, that Defendant threatened to kill her if she left, that Defendant raped her countless times, and that Defendant held her down while he raped her from behind.

The jury also heard the testimony of Chelsea Pryor, another person with whom Defendant had a relationship. Chelsea testified that Defendant told her he abused S.B.:

> A: He told - - he would tell me, uhm, that he - - how he would abuse her. What he would do to her. Uhm, strip her naked while she was pregnant, put her in the shower with cold water running on her, throw bucks of ice at her, he would tie her to a chair when she was naked and beat her with a stick or something - - beat her with something. Uhm, he locked her in a closet for a few days, starved her while she was pregnant. Uhm, that they got in an argument one time and she took a swing at him and he slammed her face into the concrete while she was pregnant.

Chelsea further explained what she meant when she said that her sex with Defendant was "sort of consensual": "Uhm, he would - - he just made you feel like you have to or he was going to do it anyway. Like, whether I wanted or not, he was going to get it anyway."

A recorded telephone conversation between S.B. and Defendant was also played for the jury. In the conversation, S.B. asked Defendant what made him rape her. Defendant responded that he was "sick in the head." Defendant also stated that he did not look at the situation with S.B. as "spousal rape." When Defendant tried to explain to the jury the context of the recorded conversation, Defendant testified that when he used the term "rape" in the recorded conversation, he was referring to the allegations made by T.G. and H.R., not to actions committed against S.B. Thus, Defendant actually used the allegations of T.G. and H.R. in his defense at trial.

17

Considering the testimony of S.B., the testimony of S.B.'s sister, the testimony of Chelsea Pryor, the recorded telephone conversation between S.B. and Defendant, and Defendant's use of the allegations of T.G. and H.R. in his defense, the testimonies of T.G. and H.R. alone would not "lure" the jury into finding Defendant guilty of the charges against him. T.G.'s and H.R.'s trial testimonies were substantially the same as their Article 404(B) hearing testimonies. There is nothing in the record to support Defendant's assertion that the jury's verdicts were the result of the testimonies of H.R. and T.G. and not the result of evidence specific to the charged offenses.

For the foregoing reasons, this court will not disturb the trial court's admission of the testimonies of H.R. and T.G. The trial judge found the testimonies of H.R. and T.G. showed a pattern of behavior in Defendant's relationship with women and were admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or fact. These testimonies, the trial court concluded, were "not simply relevant to show [Defendant's] bad character, but also to show a pattern of a deviant attitude towards women with whom he is in a relationship, his violent behavior towards them, and his methods of forcing non-consensual sex". Applying the abuse of discretion standard to the trial judge's ruling, the trial court did not abuse is discretion in admitting the testimonies of H.R. and T.G.. *See State v. Garcia*, 09-1578, (La. 11/16/12), 108 So.3d 1, *cert. denied*, ___ U.S. ___, 133 S.Ct. 2863 (2013). This assignment lacks merit.

18

## ASSIGNMENT OF ERROR NUMBER TWO

By this assignment, Defendant alleges that the trial judge erred in imposing the maximum sentence for a first-time felony offender. After a sentencing hearing, the trial judge imposed a sentence of twenty-five years at hard labor without benefit of parole, probation, or suspension of sentence for each count of simple rape (two counts), which is the maximum sentence for simple rape. For Defendant's forcible rape conviction, the trial court imposed a sentence of forty years at hard labor, with the first two years to be served without benefit of parole, probation, or suspension of sentence. Although forty years is the maximum term of imprisonment for forcible rape, two years is the minimum term for which the trial court could restrict benefits. La.R.S. 14:42.1. The trial court ordered the sentences to run concurrently.

Although the trial judge did not order a presentence investigation report, the trial judge received a victim impact statement, a report by psychologist Dr. Larry Benoit submitted on behalf of Defendant, and testimony on behalf of Defendant at the sentencing hearing. One of the witnesses to testify at the sentencing hearing was Defendant's current wife, Jordan Bergeron. Jordan and Defendant have two sons, ages two and one. Jordan also testified that before Defendant was arrested, he worked for Conoco, making approximately eight or nine thousand dollars a month. Jordan described Defendant as hard working, a good father, and a good emotional support for her. Finally, Defendant himself testified that he was twenty-four, had no prior criminal history, had three children, had won foreman of the year for Conoco, and was allowed to work out of the country while being monitored with an ankle bracelet. Defendant maintained that he did not commit any rapes.

After hearing the above, the trial court stated the following:

19

THE COURT: All right. In connection with any sentencing, the Court is guided by three goals. Those goals of sentencing are deterrence, rehabilitation and protection of the public. The Court also has to take into consideration the provisions of Article 894.1 of the Code of Criminal Procedure.

Paragraph (A) of 894.1 says that when a defendant has been convicted of a felony, the court shall impose a sentence of imprisonment if any of the following conditions occur: Number one, there is an undue risk that during the period of a suspended sentence or probation the defendant will commit another crime; number two, the defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution; and three, a lesser sentence would deprecate the seriousness of the defendant's crime.

Paragraph (B) provides the following grounds that, while not controlling the discretion of the court, in imposing a sentence [sic] should be accorded weight in its determination of suspension of sentence or probation. The Court has considered the factors of 894.1(B) as follows: The Court has considered as applicable provision number one, the offender's conduct during the commission of the offense manifested a deliberate cruelty to the victim; number four, the offender used his or her position or status to facilitate the commission of this crime; number six, the offender used threats of or actual violence in the commission of the offense; number nine, the offense resulted in significant permanent injury to the victim in this matter; and number twelve, the offender was persistently involved in similar offenses not considered as criminal history or as part of a multiple offender adjudication.

Also in paragraph (B) of 894.1 are the mitigating circumstances and this Court has taken into consideration mitigating circumstances under number twenty-eight and thirty-one. Twenty-eight is that Defendant had no prior history or prior delinquency of criminal activity and had been a law abiding citizen for a substantial period of time and thirty-one is that the imprisonment of the offender would establish excessive hardships to himself as well as to his dependents.

I think Dr. Benoit, in his analysis and his examination and report on Mr. Bergeron, was pretty insightful as to what happened here and has given the Court - - opened a window for the Court to view. Dr. Benoit found Mr. Bergeron to be anxious and irritable and prone to periodic episodes of hostility and aggressive outbursts. Dr. Benoit found that his exaggerated appraisal of his self-worth, his sense of entitlement and his tendency to blame others for his problems make it difficult for him to recognize his own limitations and lead to his repeating problems rather than correcting them and I think that's pretty accurate based on Mr. Bergeron's trial testimony as well as his testimony here today in connection with the sentencing.

The Court considers this to be a very serious matter and the Court takes this matter very seriously. The Court has wrestled with the appropriate sentences in this matter and the Court goes back to the testimony of not only the victim of this case but also of the other parties who came and testified under the 404(B) entitlement.

Based upon all of these factors, and the Court, first of all, being concerned with paragraph (A)(1) of the Code of Criminal Procedure, and that is the likelihood that this could happen again; secondly, the Court is convinced that you are in need of correctional treatment; thirdly, a lesser sentence than the Court will impose deprecates the seriousness of this offense; and furthermore, the provisions for the penalties for the violation of the crime or committing the crime of simple rape are without benefit of parole, probation and suspension of sentence, a probated or suspended sentence is not allowed in this particular case.

The Court, taking all of these matters into consideration, on count one - - actually, it was count two of the bill, the charge of simple rape, the Court sentences Mr. Bergeron to twenty-five years at hard labor without the benefit of parole, probation or suspension of sentence.

On count three, being the forcible rape charge, the Court sentences him to forty years at hard labor, the first two years without benefit of parole, probation or suspension of sentence.

On count four, being the simple rape charge, the Court sentences him to twenty-five years, hard labor, without the benefit of parole, probation or suspension of sentence.

The Court makes these sentences to run concurrent.

Although no objection was made at the sentencing hearing, Defendant timely filed a written Motion for Reconsideration of Sentence. As a reason for the trial court to reconsider the sentence, Defendant asserted that he was a first-time offender. Also, Defendant asserted that since the trial court imposed the maximum sentence, the trial court failed to consider the mitigating factors. At a hearing held on the motion to reconsider, Defendant testified that he was sexually abused as a child. Pursuant to the State's objection to such testimony, the trial court stated that this information was in Dr. Benoit's report, which the court had at the original sentencing. The trial court did not allow Defendant's testimony since it could have

been presented at the original sentencing hearing. The trial court did, however, allow Defendant to proffer the testimony concerning sexual abuse.

After Defendant testified that he lost sixty-three pounds because of the stress, the evidence was closed. The trial court then denied the motion to reconsider, stating the following:

> THE COURT: In connection with the Motion for Reconsideration of Sentence, the Motion that was filed herein was basing the Motion basically on the failure of this Court to take into consideration mitigating circumstances under Article 894.1 of the Code of Criminal Procedure.
>
> The Court, in addressing the original sentence, took into consideration all of the factors set forth in Article 894.1 and I believe that is in the sentencing minutes. Furthermore, the Court finds on this particular Motion, the Mover has failed in their burden to carry the burden of proof in this matter and the Motion is denied.

In brief, Defendant argues that the sentences imposed are excessive since Defendant is a first-time felony offender, married S.B. at a very young age, and had two children with S.B. Defendant also points out that he and S.B. had sexual intercourse many times, even after the alleged rapes occurred. S.B, Defendant asserts, did not report any incident of rape until after a custody hearing in August 2009. Even after hearing S.B.'s testimony, Defendant asserts, the jury acquitted Defendant of aggravated rape and initially failed to reach a verdict on the three remaining counts. Finally, Defendant cites cases wherein lesser sentences were imposed.

In response, the State cites cases where similar sentences have been upheld and asserts the following:

> The State asserts that the repeated, violent rapes committed by the Defendant demonstrate the most serious violation of these offenses and one of the worst types of offender. His youth, though it may have been a mitigating factor for the jury in its decision to acquit this defendant of the aggravated rape, in fact makes him the scariest type of offender who is prone to and proven an escalation in his

22

violent behavior. The evidence proved that Defendant began as a young teenager with H.R. exploring and learning the tools of isolation, coercion, manipulation, denigration and control. Defendant continued this pattern of violent and manipulative behavior with C.P. and T.G[.], which all mirrored the extensive physical and emotional abuse and rapes suffered by S.B. The report of Dr. Benoit supports these assertions by the State.

. . . .

The Court ostensibly reviewed the evidence adduced at trial and particularized this sentence to the Defendant according to the facts. It is clear by its articulated reasons that the court took **ALL** factors into consideration and carefully tailored this sentence to this defendant and to the seriousness of the matter. Again, the trial court has wide discretion in the imposition of a sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067.

Where the record demonstrates a thoroughly considered and fully particularized sentence, the State asserts that Defendant's sentence is constitutionally sound, adequately particularized to this offender, and proportionate to the crime. Accordingly, the State asserts that this allegation is without merit and prays that this Court finds the same.

The law is well settled concerning the standard to be used in reviewing

excessive sentence claims:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v.*

> *Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*,
> 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
>
> *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01),
> 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La.2/1/02), 808 So.2d
> 331.
>
> . . . [E]ven when a sentence falls within the statutory sentencing
> range, it still may be unconstitutionally excessive, and in determining
> whether a sentence shocks the sense of justice or makes no
> meaningful contribution to acceptable penal goals, this court has
> suggested that several factors may be considered:
>
> > [An] appellate court may consider several factors
> > including the nature of the offense, the circumstances of
> > the offender, the legislative purpose behind the
> > punishment and a comparison of the sentences imposed
> > for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00);
> > 766 So.2d 501. While a comparison of sentences
> > imposed for similar crimes may provide some insight, "it
> > is well settled that sentences must be individualized to
> > the particular offender and to the particular offense
> > committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1
> > Cir.1991). Additionally, it is within the purview of the
> > trial court to particularize the sentence because the trial
> > judge "remains in the best position to assess the
> > aggravating and mitigating circumstances presented by
> > each case." *State v. Cook*, 95-2784 (La.5/31/96); 674
> > So.2d 957, 958.
>
> *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786,
> 789, *writ denied*, 03-562 (La.5/30/03), 845 So.2d 1061.

*State v. Decuir*, 10-1112, pp. 11-13 (La.App. 3 Cir. 4/6/11), 61 So.3d 782, 790-91

(first and third alterations in original).

In the present case, Defendant received the maximum term of imprisonment

for each of the counts for which he was convicted. La.R.S. 14:42.1 and La.R.S.

14:43. It is well-settled that "[m]aximum sentences are reserved for the most

serious violations and the worst offenders." *State v. Farhood*, 02-490, p. 11

(La.App. 5 Cir. 3/25/03), 844 So.2d 217, 225 (citing *State v. Sullivan*, 02-35

(La.App. 5 Cir. 4/30/02), 817 So.2d 335). As previously stated, even though the

trial judge imposed the maximum term of imprisonment for forcible rape, he

imposed the minimum restriction of benefits – two years. Additionally, the maximum sentences were ordered to run concurrently rather than consecutively. The rapes for which Defendant was convicted occurred at different times and all occurred in a violent manner, the trial court could have ordered the sentences to run consecutively. La.Code Crim.P. art. 883; *State v. Bartie*, 12-673, (La.App. 3 Cir. 12/5/12), 104 So.3d 735, *writ denied*, 13-39 (La. 8/30/13), 120 So.3d 256. Thus, Defendant received a significant reduction in sentencing exposure by the trial court's decision to order the sentences to run concurrently.

As for the sentences imposed in other simple rape cases, we note the following: *State v. Cleveland*, 12-163 (La.App. 4 Cir. 4/10/13), 115 So.3d 578, *writ denied*, 13-926 (La. 11/8/13), 125 So.3d 444 (fifteen-year sentence was upheld for simple rape committed by a defendant performing oral sex on a victim who was apparently unconscious from drinking); *State v. Clark*, 05-647 (La.App. 3 Cir. 12/30/05), 918 So.2d 552 (fifteen-year sentence without benefits for simple rape was found to be excessive when rape was committed by a thirty-one year old, single father who received an honorable discharge from the U.S. Army and the National Guard, who was a first felony offender, and who claimed that he engaged in consensual sex with the victim); *State v. Despanie*, 06-1269 (La.App. 3 Cir. 2/7/07), 949 So.2d 1260 (maximum twenty-five year sentence without benefits was upheld for plea of no contest to an amended charge of simple rape where defendant, a certified nursing assistant at a long-term care facility, was seen having sex with a ninety-two year-old female suffering from dementia).

As for sentences imposed in other forcible rape cases, we note the following: *State v. Kelly*, 12-1197 (La.App. 1 Cir. 4/1/13) (unpublished opinion), *writ denied*, 13-1332 (La. 11/8/13), 125 So.3d 450 (maximum forty-year sentence with two

25

years without benefits was upheld for rape committed after defendant entered the victim's home, violently forced the victim to engage in vaginal intercourse, attempted to force the victim to engage in oral sex, and placed a pillow over the victim's face); *State v. J.S.*, 10-1233 (La.App. 3 Cir. 5/11/11), 63 So.3d 1185 (thirty-years, ten of which was without benefits, was affirmed for a forcible rape committed by a fourth felony offender who tied the victim to a bedpost, blindfolded her, gagged her, and violently raped her, even though defendant claimed that he and the victim had consensual sexual intercourse thereafter); *State v. Colgin*, 43-416 (La.App. 2 Cir. 8/13/08), 989 So.2d 876, *writ denied*, 08-2304 (La. 5/15/09), 8 So.3d 581 (maximum forty-year sentence with fifteen years to be served without benefits was upheld when defendant pled guilty pursuant to plea agreement and defendant was a second-felony offender who had oral sex with a ten-year-old child); *State v. Jacobs*, 07-1370 (La.App. 3 Cir. 6/5/08), 987 So.2d 286, *writ denied*, 08-2000 (La. 4/3/09), 6 So.3d 769 (thirty-year sentence upheld for forcible rape committed by a defendant with a significant criminal history and committed when Defendant broke into the victim's motel room, took money from her purse, and engaged in non-consensual sex with the victim); *State v. Steele*, 10-1336 (La.App. 3 Cir. 5/4/11), 63 So.3d 412 (thirty-year sentence without benefits was affirmed when defendant pled guilty to a forcible rape committed when Defendant offered the victim a ride home, took the victim to a gravel road, repeatedly raped the victim, punched the victim in the face, banged the victim's head against the dashboard, and left the victim stranded).

Considering the trial judge's well-articulated reasons for the sentences, the violent nature of the rapes, the imposition of the sentences to run concurrently, and

the trial court's restriction of the minimum number of years to be served without benefits for forcible rape, none of the sentences imposed are excessive.

**DECREE**

Defendant's convictions and sentences are affirmed.

**AFFIRMED.**

STATE OF LOUISIANA

VERSUS

STEPHAN M. BERGERON

**THIBODEAUX, Chief Judge, concurring in part and dissenting in part.**

I concur with the majority that the defendant's convictions should be affirmed. I disagree, however, with the imposition of maximum sentences on this first-time offender.

The defendant is a first-time offender, has remarried with two children, and has held a solid job with Conoco Phillips, having been selected as the "foreman of the year." While the defendant's conduct cannot be condoned, the record does not reflect that he was a "worst offender." I rely on *State v. Fruge*, 13-1386 (La.App. 3 Cir. 5/7/14), 139 So.3d 602, as jurisprudential support that these sentences are excessive given the circumstances of this case.

For the foregoing reasons, I dissent in part.